O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

DEBRA L. FOSTER,

               Plaintiff,

     v.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

               Defendant.

Case No. EDCV 11-1077-OP

MEMORANDUM OPINION; ORDER

The Court[1] now rules as follows with respect to the disputed issues listed in the Joint Stipulation ("JS").[2]

/ / /

/ / /

/ / /

_____

   [1] Pursuant to 28 U.S.C. § 636(c), the parties consented to proceed before the United States Magistrate Judge in the current action. (ECF Nos. 6, 7.)

   [2] As the Court stated in its Case Management Order, the decision in this case is made on the basis of the pleadings, the Administrative Record, and the Joint Stipulation filed by the parties. In accordance with Rule 12(c) of the Federal Rules of Civil Procedure, the Court has determined which party is entitled to judgment under the standards set forth in 42 U.S.C. § 405(g). (ECF No. 4 at 3.)

1

## I.

## DISPUTED ISSUES

As reflected in the Joint Stipulation, the disputed issues raised by Plaintiff as the grounds for reversal and/or remand are as follows:

(1)     Whether the Administrative Law Judge ("ALJ") properly considered the treating physician's opinion regarding Plaintiff's depression and anxiety; and

(2)     Whether the ALJ properly considered Plaintiff's credibility.

(JS at 5.)

## II.

## STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), this Court reviews the Commissioner's decision to determine whether the Commissioner's findings are supported by substantial evidence and whether the proper legal standards were applied.  DeLorme v. Sullivan, 924 F.2d 841, 846 (9th Cir. 1991).  Substantial evidence means "more than a mere scintilla" but less than a preponderance.  Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971); Desrosiers v. Sec'y of Health & Human Servs., 846 F.2d 573, 575-76 (9th Cir. 1988).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson, 402 U.S. at 401 (citation omitted).  The Court must review the record as a whole and consider adverse as well as supporting evidence.  Green v. Heckler, 803 F.2d 528, 529-30 (9th Cir. 1986). Where evidence is susceptible of more than one rational interpretation, the Commissioner's decision must be upheld.  Gallant v. Heckler, 753 F.2d 1450, 1452 (9th Cir. 1984).

/ / /

/ / /

/ / /

# III.

## DISCUSSION

**A.    The ALJ's Decision.**

The ALJ, F. Keith Varni, found that Plaintiff has the severe impairment of osteoarthritis of the right knee.  (AR at 21.)  He specifically found that her "medically determinable mental impairments of anxiety disorder, depressive disorder, and drug abuse, in remission, does [sic] not cause more than minimal limitation in the claimant's ability to perform basic mental work activities."  (Id. at 22.)  The ALJ further found that Plaintiff has the residual functional capacity ("RFC") to perform the full range of light work; can lift and/or carry twenty pounds occasionally and ten pounds frequently; has no sitting limitation; is able to stand and/or walk for six to eight hours in an eight-hour workday; requires an assistive device for prolonged ambulation; and is not able to kneel or squat.  (Id. at 24.)  Finally, the ALJ found that Plaintiff is capable of performing her past relevant work as a sandwich maker, and a security guard checking exiting customer's receipts, as actually performed.  (Id. at 26.)

**B.    Whether the ALJ Properly Considered the Treating Physician's Opinion Regarding Plaintiff's Depression and Anxiety.**

**1.    Background.**

The ALJ expressly found that Plaintiff's depression and anxiety "do not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and [are] therefore nonsevere."  (Id. at 22.)  In arriving at this finding, the ALJ reviewed the assessments of Plaintiff's treating physician, Dr. Michelle Clark, and that of a psychiatrist at the Kedren Community Mental Health Clinic ("Kedren Clinic").  He discounted these two opinions as well as the opinion of the State agency reviewing physician, Dr. R. Tashjian, giving great weight to the opinion of Dr. Sohini Parikh, the consulting examining psychiatrist. (Id. at 23.)

Plaintiff contends the ALJ's rationales for granting little or no weight to the opinions of the two treating psychiatrists and the State agency review physician, all of whom she claims endorsed greater mental functional limitations than found by the ALJ, "are significantly logically flawed." (JS at 6.) Specifically, she focuses on the global assessment of functioning ("GAF") score of 42[3] assessed by Dr. Clark, and the GAF score of 47 assessed by the Kedren Clinic. (Id.) Plaintiff also complains that the ALJ improperly rejected the moderate mental function limitations endorsed by Dr. Tashjian, on the basis that Dr. Tashjian's findings were not supported by the "evidence as a whole." (Id. at 12 (citing AR at 23).)

## 2.   **Legal Standards.**

It is well-established in the Ninth Circuit that a treating physician's opinions are entitled to special weight, because a treating physician is employed to cure and has a greater opportunity to know and observe the patient as an individual. McAllister v. Sullivan, 888 F.2d 599, 602 (9th Cir. 1989). "The treating physician's opinion is not, however, necessarily conclusive as to either a physical condition or the ultimate issue of disability." Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989). The weight given a treating physician's opinion depends on whether it is supported by sufficient medical data and is consistent with other evidence in the record. See 20 C.F.R. § 404.1527(d)(2). If the treating physician's opinion is uncontroverted by another doctor, it may be rejected only for "clear and convincing" reasons. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995); Baxter v. Sullivan, 923 F.2d 1391, 1396 (9th Cir. 1991). If the treating physician's opinion is controverted, it may be rejected only if the ALJ makes

---

[3] A GAF score between 41 and 50 indicates serious symptoms (e.g., suicidal ideation, obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). Diagnostic and Statistical Manual of Mental Disorders 34 (American Psychiatric Ass'n ed., 4th ed. 2000) ("DSM-IV").

1  findings setting forth specific and legitimate reasons that are based on the
2  substantial evidence of record.  Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir.
3  2002); Magallanes, 881 F.2d at 751; Winans v. Bowen, 853 F.2d 643, 647 (9th
4  Cir. 1987).  As with a treating physician, the controverted findings of an
5  examining physician may only be rejected by the ALJ for specific and legitimate
6  reasons supported by substantial evidence in the record.  Lester, 81 F.3d at 830-31
7  (citing Andrews v. Shalala, 53 F.3d 1035, 1043 (9th Cir. 1995)).

8       With regard to GAF scores, the Commissioner has no obligation to credit or
9  even consider GAF scores in the disability determination.  See 65 Fed. Reg.
10  50746, 50764-65 (Aug. 21, 2000) ("The GAF scale . . . is the scale used in the
11  multiaxial evaluation system endorsed by the American Psychiatric Association.
12  It does not have a direct correlation to the severity requirements in our mental
13  disorders listings."); see also Howard v. Comm'r of Soc. Sec., 276 F.3d 235, 241
14  (6th Cir. 2002) ("While a GAF score may be of considerable help to the ALJ in
15  formulating the RFC, it is not essential to the RFC's accuracy.  Thus, the ALJ's
16  failure to reference the GAF score in the RFC, standing alone, does not make the
17  RFC inaccurate.").  GAF scores include a significant number of non-medical
18  factors, such as homelessness and legal troubles, that do not necessarily translate
19  into work-related functional impairments.  DSM-IV 33.  Further, GAF scores
20  reflect the "clinician's judgment of the individual's overall level of functioning."
21  Id. 32.  They encompass "psychological, social and occupational functioning," but
22  are not meant to be a conclusive medical assessment of overall functioning, but
23  rather, are only intended to be "useful in planning treatment[,] . . . measuring its
24  impact, and in predicting outcome."  Id.

25       **3.   Analysis.**

26       According to Plaintiff, the ALJ provided several flawed rationales for
27  discrediting the GAF scores assessed by Dr. Clark and the Kedren Clinic:  (1) the
28  GAF scores of 42 assessed by Dr. Clark and of 47 assessed by the Kedren Clinic,

1  were based largely on Plaintiff's subjective symptoms; (2) Dr. Clark's later

2  assessments and mental status reports indicate a much higher level of functioning

3  than reflected by her initial GAF score of 42; and (3) Dr. Clark's mental disorder

4  questionnaire did not delineate any limitations that would establish a finding of

5  severe impairment. (JS at 10-12 (citations omitted).)  Plaintiff contends that none

6  of these rationales "is a reasonable interpretation of the treatment record." (Id. at

7  6, 10.)

8          **a.     The GAF Scores Were Based on Plaintiff's Subjective**

9          **Symptoms.**

10         The ALJ found that the GAF scores suggested both by Dr. Clark and at the

11  Kedren Clinic were based largely on Plaintiff's subjective symptoms.  (AR at  22.)

12  Although Plaintiff contends there is no evidentiary basis for that presumption,

13  both GAF scores were suggested as part of an intake assessment.  (Id. at 265, 334-

14  37.)  As such, the GAF scores were a "snapshot" assessment of Plaintiff's

15  condition at the time she presented to either clinic, and were based primarily on

16  Plaintiff's self-reports.  (Id. at 265-69, 334-37.)  There is no indication that any

17  other objective testing was conducted as part of the intake assessments.  (Id.)  "An

18  ALJ may reject a treating physician's opinion if it is based 'to a large extent' on a

19  claimant's self-reports that have been properly discounted as incredible."

20  Tommasetti v. Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008) (citation omitted).

21  Furthermore, "the ALJ is the final arbiter with respect to resolving ambiguities in

22  the record."  Id.

23         As discussed in detail below (see Discussion supra Part III.B.3.b), the

24  longitudinal evidence, including later treatment records from Dr. Clark, indicates

25  Plaintiff's continued improvement with medication and treatment and, in any

26  event, is consistent with the ALJ's RFC findings.

27  / / /

28  / / /

6

### b.   No Support for GAF Scores in Other Examinations or Mental Status Reports.

The ALJ discounted the GAF scores of 42 and 47 in part because "[s]ubsequent examinations and mental status reports [by Dr. Clark] indicate a much higher level of functioning." (AR at 22 (citing id. at 313-37).)  Plaintiff contends this was error because Dr. Clark's later treatment notes "contain no other GAF scores," and the "ALJ's declaration to the contrary is simply false." (JS at 11.)

A review of Dr. Clark's treatment notes indeed finds no other GAF score suggested by Dr. Clark.  However, the ALJ did not state that Dr. Clark assessed later GAF scores.  A reasonable interpretation of the ALJ's finding is that Dr. Clark's later treatment notes failed to lend support to the GAF score assessed at intake.  Plaintiff points to no records that are inconsistent with the ALJ's reasons for rejecting Dr. Clark's initial GAF assessment.  In fact, this Court's review of Dr. Clark's treatment notes supports the ALJ's finding that Plaintiff was able to function at a higher level than the initial intake GAF score of 42 would seem to indicate:

Plaintiff began seeing Dr. Michelle Clark in November of 2008, and saw her monthly through October 2009.  (AR at 314-37.)  On initial evaluation, Dr. Clark noted that Plaintiff presented with a strong family history of mood disorder, and lifelong symptoms of mood and anxiety disturbance aggravated by trauma and loss.  (Id. at 337.)  She diagnosed Plaintiff with major depression, severe, non-psychotic, and assessed a GAF score of 42.  (Id.)  Dr. Clark prescribed Paxil for treatment of anxiety and dysphoria.  (Id.)

In December 2008, Plaintiff reported her son had been hospitalized because of a bipolar disorder, she had to take a week off of work because of her knee, and she could not think straight and was nauseated by the medication.  (Id. at 314.)  Dr. Clark noted Plaintiff had also obtained some relief from a "hypnotic"

7

1  medication prescribed by her primary care physician.  (Id. at 314-15.)  Dr. Clark

2  noted Plaintiff's complaint of nausea as a side effect of the medication,

3  discontinued the Paxil, continued the sleep aid, and began treatment with Lexapro.

4  (Id. at 315.)  In her Objective/Mental Status Exam, Dr. Clark noted Plaintiff was

5  tense and dysphoric but that her affect was appropriate; judgment, insight, and

6  impulse control were good; she was alert, attentive, and oriented; concentration

7  and memory were intact; and her thought processes were linear.  (Id.)

8         On January 8, 2009, Plaintiff reported to Dr. Clark that it was "getting really

9  stressful @work," that her concentration was "no where," that her knees and legs

10 were bothering her, and that she was sad every day for about two to three hours.

11 (Id. at 316.)  Dr. Clark noted a "favorable response to medication" but that

12 Plaintiff "may respond better with a higher dose," and increased the Lexapro to 20

13 mg per day.[4]  (Id. at 317.)  In her Objective/Mental Status Exam, Dr. Clark noted

14 Plaintiff was tense and dysphoric but that her affect was appropriate; judgment and

15 impulse control were good; insight was fair; she was alert, attentive, and oriented;

16 her thought processes were linear; and there was some decrease in concentration

17 and memory.  (Id.)

18        On February 5, 2009, Plaintiff reported the medication was helping her but

19 on some days she felt frustrated for no reason and could not be around a lot of

20 people.  (Id. at 318.)  Dr. Clark noted "some improvement" and also indicated that

21 Plaintiff was still experiencing frustration and irritability.  (Id.)  She also noted

22 that Plaintiff was particularly bothered by loud noise and had made progress in

23 setting limits.  (Id.)  Plaintiff remained depressed about her granddaughter being in

24 the foster care system.  (Id.)  In her Objective/Mental Status Exam, Dr. Clark

25 noted Plaintiff was tense and dysphoric but that her affect was appropriate;

26 _____

27      [4]  Plaintiff incorrectly notes the Lexapro was *decreased* because of
   insomnia.  In fact, the note merely states "Increase lexapro to 20 mg. - may take
28 [illegible] if insomnia worse."  (AR at 317.)

1  judgment and impulse control were good; insight was fair; she was alert, attentive,
2  and oriented; concentration and memory were intact; and her thought processes
3  were linear.  (Id. at 319.)

4      On February 5, 2009, Dr. Clark also completed a Mental Disorder
5  Questionnaire Form.[5]  (Id. at 258-62.)  She stated that she found Plaintiff polite
6  and cooperative; often tearful and overwhelmed by multiple losses in her life; and
7  with a predominantly dysphoric mood.  (Id. at 262.)  She also stated that although
8  Plaintiff complained of poor concentration and short-term memory loss, she had
9  no deficits; suffers severe insomnia and anxiety; experiences visual illusions; was
10  employed but was having difficulty managing public transportation; attempted
11  visitation with her granddaughter in foster care; has few friends; was somewhat
12  isolated; was independent in her activities of daily living; could follow three-step
13  commands; and had been criticized at work for being "slow," but had no difficulty
14  with coworkers.  (Id.)  She concluded that Plaintiff's prognosis was "good."  (Id.)

15      On March 5, 2009, Plaintiff reported improved mood yet continued
16  symptoms of anxiety and an increased startle reaction.  (Id. at 320.)  Plaintiff
17  denied any medication side effects.  (Id.)  Plaintiff reported some problem at the
18  workplace regarding harassment and discrimination, feeling that her coworkers
19  were speaking in Spanish to malign her without her knowledge.  (Id.)  The notes
20  reflect that Plaintiff believed her manager supported her, but the assistant manager

21
22
23
_____

24     [5]  Plaintiff incorrectly contends this form was completed *after* the November
25  8, 2009, treatment.  (JS at 9.)  However, the form is dated much earlier, on
    February 5, 2009, and indicates that the date of last examination had been January
26  8, 2009.  (AR at 262 (see also id. at 316).)  As the report also indicates that
    Plaintiff was still employed, and Plaintiff has stated she did not leave her job until
27  June 2009, there is no reason to believe the form was completed on the later date
28  indicated by Plaintiff.

1   did not.  (Id.)  Dr. Clark noted that Plaintiff presented as "loquacious"[6] and was

2   responding well to medications and coping properly with stressors.  (Id. at 321.)

3   Dr. Clark also noted that Plaintiff might benefit from vitamins to help her with

4   perimenopausal symptoms and prescribed vitamin B6 and Centrum Sr.  (Id.)  In

5   her Objective/Mental Status Exam, Dr. Clark noted Plaintiff was tense and

6   dysphoric but that her affect was appropriate; judgment and impulse control were

7   good; insight was fair; she was alert, attentive, and oriented; concentration had

8   decreased but memory was intact; and her thought processes were linear.  (Id.)

9          On April 7, 2009, Plaintiff told Dr. Clark that she was "feeling OK," and

10  that "Most days are better - some are iffy."  (Id. at 322.)  She also stated that she

11  believed that "if I get away from that environment I'll be alright," and hoped to

12  move soon.  (Id.)  Dr. Clark noted that Plaintiff's "job remained stressful and her

13  neighborhood is [a] disaster."  (Id.)  Although Plaintiff reported experiencing early

14  morning awakening ("EMA"), her "bad dreams were gone."  (Id. at 323.)  Dr.

15  Clark noted that Plaintiff had experienced an "improvement in all symptoms," but

16  that her sleep remained disturbed, and she might benefit from an increase in the

17  dosage of the sleep aid.  (Id.)  In her Objective/Mental Status Exam, Dr. Clark

18  noted Plaintiff was tense and dysphoric but that her affect was appropriate;

19  judgment and impulse control were good; insight was fair; she was alert, attentive,

20  and oriented; concentration and memory were intact; and her thought processes

21  were linear.  (Id.)

22         On May 7, 2009, Plaintiff reported "I've been doing better but . . . it's just I

23  don't know seems like every month when my period comes . . . sometimes I just

24  wanna give up . . . it seems like everything bothers me . . . "  (Id. at 324.)  Dr.

25

26         [6] Plaintiff incorrectly states that Dr. Clark noted "excessive

27  loquaciousness."  (JS at 8.)  In fact, Dr. Clark crossed out the word "Excessive" in
    the Mental Status Exam category describing Plaintiff's speech, and wrote in

28  "Loquacious."  (AR at 321.)

1  Clark noted that Plaintiff described ongoing irritability provoked by dysfunctional
2  family members, remained adherent to her medication regimen, and did not
3  complain of any medication side effects.  (Id.)  She also noted that Plaintiff "is
4  making progress and attending to her health." (Id. at 325.)  She increased
5  Plaintiff's dosage of Celexa.  (Id.)  In her Objective/Mental Status Exam, Dr.
6  Clark noted Plaintiff was tense and irritable but that her affect was appropriate;
7  judgment and impulse control were good; insight was fair; she was alert, attentive,
8  and oriented; concentration and memory were intact; and her thought processes
9  were linear.  (Id.)

10      On June 9, 2009, Plaintiff complained to Dr. Clark of anxiety over changes
11  in her housing - she had applied to move her Section 8 housing to San Bernardino
12  and was afraid her application was "in jeopardy" because of problems with her
13  soon-to-be eighteen-year-old son's record.  (Id. at 326.)  Dr. Clark also noted that
14  Plaintiff "is out of work due to remodeling of the store."[7]  (Id. at 326.)  Also in
15  June, Dr. Clark reported that Plaintiff was "fearful of losing income and housing."
16  (Id. at 327.)  In her Objective/Mental Status Exam, Dr. Clark noted Plaintiff was
17  tense and dysphoric but that her affect was congruent; judgment and impulse
18  control were good; insight was fair; she was alert, attentive, and oriented; and her
19  thought processes were linear.  (Id.)

20      On July 16, 2009, Plaintiff reported she had moved, it was more peaceful
21  for her at her new home, but that she still had not been sleeping.  (Id. at 328.)  In

22

23  _____

24      [7]  This seems to conflict with Plaintiff's testimony at the hearing where she
    indicated that because her doctor had said she could not work, the manager of the
25  store let her go, telling her she was not able to fulfill her duties.  (AR at 36-37.)
    The Court also notes that at the time she was working at the Subway, Plaintiff
26  lived in Los Angeles and the Subway she worked at also was located in Los
    Angeles.  (Id. at 137, 141).  The record indicates that Plaintiff moved to San
27  Bernardino sometime between June 9, 2009, and July 16, 2009.  (See, e.g., id. at
28  326, 328, 354, 363.)

1    her Objective/Mental Status Exam, Dr. Clark noted Plaintiff was tense, dysphoric,

2    and anxious but her affect was congruent; judgment and impulse control were fair;

3    insight was fair to poor; she was alert, attentive, and oriented; concentration and

4    memory were intact; and her thought processes were linear. (Id. at 329.)

5        In September 2009, Plaintiff reported to Dr. Clark that she had been having

6    mood swings and there was "a lot going on." (Id. at 330.) Dr. Clark noted that

7    Plaintiff was "frustrated, angry and overwhelmed by multiple psychosocial

8    problems." (Id.) Apparently, her new apartment had been burglarized, she was in

9    chronic pain and struggling with her changed insurance, and she was "in the midst

10   of custody of her 17 yr. old son." (Id.) Despite this, Dr. Clark reported that

11   Plaintiff "remained stable on current regimen," and was "proceeding appropriately

12   to her goals." (Id. at 331.) In her Objective/Mental Status Exam, Dr. Clark noted

13   Plaintiff was tense and dysphoric but her affect was congruent; judgment was

14   good; impulse control and insight were fair; she was alert; and her thought

15   processes were linear. (Id.)

16       Dr. Clark's last progress note in October 2009 noted that Plaintiff had

17   "relocated to the North Valley" and complained of the slower traffic in her

18   commute, but preferred the quiet spacious neighborhood. (Id. at 332.) She also

19   noted that Plaintiff "has been stabilized on the current regimen," and denied any

20   side effects from her medication except "possibly AM headache and nausea." (Id.

21   at 333.) In her Objective/Mental Status Exam, Dr. Clark noted Plaintiff was tense;

22   her mood was euthymic[8] and her affect was congruent; judgment and impulse

23   control were good; insight was fair; she was alert, attentive, and oriented;

24   concentration was reduced; memory was intact; and her thought processes were

25   linear. (Id.)

26       In sum, the Court finds that the record more than supports the ALJ's

27

28

───────────────

[8] Euthymia indicates a reasonably positive mood.

assessment that Dr. Clark's later notes did not show the level of functioning associated with the initial GAF score of 42.

### c.  Dr. Clark's Additional Questionnaire Responses.

Plaintiff claims that the ALJ improperly discredited Dr. Clark's GAF assessment by relying on the February 2009 questionnaire wherein Dr. Clark noted that Plaintiff is independent in her activities of daily living, can follow three-step instructions, and has no difficult with coworkers.  (JS at 11 (citing AR at 22-23, 260-61).)  Plaintiff claims this is an incomplete summary of Dr. Clark's report and omits her additional opinions that Plaintiff was having difficulty managing public transportation, had her grandchild taken from her, had few friends and was somewhat socially isolated, and had been criticized at work for being slow.  (Id.)  She claims those additional limitations "would certainly impact [Plaintiff's] ability to regularly perform the mental requirements of substantial gainful activity."  (Id.)  The Court does not agree that there is any evidence in Dr. Clark's reports or elsewhere in the record that although Plaintiff was experiencing these difficulties, these events indicated any functional limitations or in any way impacted Plaintiff's ability to perform the mental requirements of work.[9]  Indeed, at the time Dr. Clark completed her February 2009 report, Plaintiff *was* gainfully employed.  Thus, the Court finds that this was a valid reason for discounting Dr. Clark's GAF assessment.

### d.  Kedren Clinic GAF Assessment.

With regard to the Kedren Clinic GAF assessment, the ALJ also noted that the record reflected Plaintiff's subjective complaints and did not document either observed behavior or Plaintiff's response to treatment over time.  (Id. at 11.)  The Kedren Clinic notes reflect that on August 1, 2008, Plaintiff presented for

_____

[9]  The fact that Plaintiff had few friends and was socially isolated may lend support, in part, for the GAF score assessed by Dr. Clark, as a score between 41 and 50 may reflect that an individual has "no friends."  DSM IV 34.

1   outpatient treatment.  (AR at 265-74.)  She presented with symptoms of daily

2   sadness; frustration; anger outbursts; mood swings; poor appetite; sleep

3   disturbance; racing thoughts; visual hallucinations of "a light or shadow," which

4   she believed might be her deceased daughter; isolative behavior; paranoid

5   ideation; nervousness around people; poor concentration/ focus; irritability;

6   anxiety like symptoms; and psychosocial stressors.  (Id. at 265.)  Based on this

7   intake assessment, Plaintiff was diagnosed with a Mood Disorder NOS and given

8   a GAF score of 47.  (Id. at 269.)  The August 14, 2008, progress note indicated

9   Plaintiff was still feeling "stressed out," depressed, angry, overwhelmed, and upset

10  about her granddaughter that had been taken away from her.  (Id. at 273.)  She had

11  been offered individual supportive therapy to vent "stressors and concerns," and

12  "discuss court hearing," was cooperative, and agreed to follow up with therapy

13  and her treatment plan.  (Id. at 270, 273.)  The February 13, 2009, Discharge

14  Summary reflects, however, that Plaintiff "did not follow up . . . or continue

15  w/recommended [treatment] plan as agreed.  Attempts to contact client were

16  unsuccessful."  (Id. at 270.)  The Discharge Summary indicated a discharge date of

17  August 14, 2008, presumably the last service date.  (Id.)

18      The Commissioner's regulations provide that more weight is given to

19  longitudinal opinion evidence.  20 C.F.R. § 416.927(d)(2).  As previously

20  discussed, the GAF score assessed by the Kedren Clinic was a "snapshot"

21  assessment of Plaintiff's condition at the time she presented to the clinic and was

22  based primarily on Plaintiff's self-reports.  As she apparently only visited the

23  clinic once more, two weeks after her initial visit, the Kedren Clinic records do not

24  constitute any kind of longitudinal assessment of Plaintiff's mental health.  Indeed,

25  the longitudinal evidence, including Plaintiff's later treatment records with Dr.

26  Clark, reflect Plaintiff's improvement with medication and treatment and is not

27  inconsistent with the ALJ's RFC findings.  Thus, the Court finds that there was no

28  error in discounting the Kedren Clinic GAF score on this basis.

14

1          **e.    Dr. Tashjian's Limitations.**

2          Plaintiff contends that the ALJ also improperly rejected the May 29, 2009,

3   findings of the State agency reviewing physician, Dr. Tashjian.  (JS at 12.)  Dr.

4   Tashjian found moderate limitations in Plaintiff's ability to understand, remember,

5   carry out detailed instructions, interact appropriately with the public; and respond

6   appropriately to workplace changes.  (AR at 308-09.)  Dr. Tashjian also found

7   Plaintiff capable of performing simple, repetitive tasks.  (Id. at 310.)

8          The ALJ found that Dr. Tashjian's findings were not supported by the

9   evidence as a whole and gave more weight to the March 3, 2009, opinion of the

10  consultative examiner, Dr. Parikh.  (Id. at 23.)  Dr. Parikh assessed Plaintiff with a

11  GAF score of 65, which the ALJ noted reflected mild symptoms.  (Id. (citing id. at

12  287).)  Dr. Parikh also stated that Plaintiff's "functional assessment is normal, if

13  she complies with medications," and found no restrictions or difficulties in daily

14  activities or social functioning.  (Id. at 287.)  She also found no impairment in

15  Plaintiff's concentration, persistence, and pace, ability to understand, carry out,

16  and remember simple and complex instructions, and her ability to respond

17  appropriately to coworkers, supervisors, the general public, and usual work

18  situations, including her ability to deal with changes in a routine work setting.  (Id.

19  at 287-88.)  Because an examining physician, such as Dr. Parikh, provides an

20  assessment based on independent clinical findings, such an examination may be

21  considered to be substantial evidence, even if it varies from that of a treating or

22  non-examining physician.  Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir.

23  2001); 20 C.F.R. §§ 404.1527(d), (f), 416.927(d), (f) (providing that more weight

24  generally is given to the opinions of examining physicians over non-examining

25  physicians).  Thus, the Court finds that there was no error in the ALJ's discounting

26  Dr. Tashjian's opinion.

27  / / /

28  / / /

15

1   **C.    The ALJ Properly Assessed Plaintiff's Credibility.**

2        **1.    Background.**

3       As noted by the ALJ, Plaintiff testified at the hearing and/or noted in her

4   Function Report - Adult (AR at 174-81) that as a result of her physical and mental

5   impairments she had constant back pain, that her leg went out, that she could not

6   focus at work, that she gets angry a lot, that she gets headaches, that she had

7   difficulty sleeping, lifting, squatting, bending, standing, kneeling, and climbing

8   stairs, that she was unable to work because of pain standing and being slow, and

9   that she could sit for no more than twenty minutes at a time, and stand for no more

10   than five minutes at a time.  (<u>Id.</u> at 24.)  She also testified that she became unable

11   to work because of difficulty standing, she was slow, and she took too many

12   breaks.  (<u>Id.</u>)

13       In his opinion denying benefits, the ALJ rejected Plaintiff's subjective

14   complaints as follows:

15            The claimant's allegations are not altogether [sic] with the other

16        statements that she has made.  For example, the claimant's admission

17        that she worked until June 2009 is not consistent with her allegation of

18        inability to work and the inability to focus at work due to her

19        impairments.  It is unlikely the claimant could have held a job for so

20        long after the alleged onset date (*i.e.*, nearly two years)[10] if she truly

21        could not focus at work.  These inconsistencies detract from the

22        credibility of the claimant's allegations.

23            In addition, as discussed previously, the claimant is able to

24        perform many, if not most, activities of daily living.  She admits:  she

25        can drive a car and use public transportation; she shops, pays bills, and

26   ———————————————

27       [10]  Plaintiff correctly notes that she worked approximately seven months

28   from her alleged date of onset, not "nearly two years."  (JS at 21-22.)  The
incorrect statement makes no difference in the Court's analysis.

1  manages her finances; she goes to work and church regularly; she has no

2  problems with self-care; she does household chores and she prepares

3  meal[s].  The claimant's admitted functional level exceeds her alleged

4  level of impairment.  This contradiction undermines the credibility of

5  the claimant's allegations.

6  (Id. at 25 (citation omitted).)

7       Plaintiff faults the ALJ for failing to provide sufficient reasons for rejecting

8  her subjective complaints of impairment.  (JS at 21-23.)

9       **2.**    **Legal Standard.**

10       An ALJ's assessment of pain severity and claimant credibility is entitled to

11  "great weight."  Weetman v. Sullivan, 877 F.2d 20, 22 (9th Cir. 1989); Nyman v.

12  Heckler, 779 F.2d 528, 531 (9th Cir. 1986).  When, as here, an ALJ's disbelief of a

13  claimant's testimony is a critical factor in a decision to deny benefits, the ALJ

14  must make explicit credibility findings.  Rashad v. Sullivan, 903 F.2d 1229, 1231

15  (9th Cir. 1990); Lewin v. Schweiker, 654 F.2d 631, 635 (9th Cir. 1981); see also

16  Albalos v. Sullivan, 907 F.2d 871, 874 (9th Cir. 1990) (an implicit finding that

17  claimant was not credible is insufficient).

18       In assessing the credibility of the allegedly disabling subjective symptoms,

19  an ALJ may properly consider "[t]he nature, location, onset, duration, frequency,

20  radiation, and intensity" of any pain or other symptoms; "[p]recipitating and

21  aggravating factors;" "[t]ype, dosage, effectiveness, and adverse side-effects of

22  any medication;" "[t]reatment, other than medication;" "[f]unctional restrictions;"

23  "[t]he claimant's daily activities;" "unexplained, or inadequately explained, failure

24  to seek treatment or follow a prescribed course of treatment;" and "ordinary

25  techniques of credibility evaluation."  Bunnell v. Sullivan, 947 F.2d 341, 346-47

26

27

28

1   (9th Cir. 1991) (en banc) (citations omitted); <u>see also</u> Soc. Sec. Ruling 96-7p;[11] 20

2   C.F.R. 404.1529 (2005); <u>Magallanes</u>, 881 F.2d at 756 (an ALJ may take into

3   account a claimant's level of activity, along with other probative evidence of

4   disability or lack thereof); <u>Morgan v. Comm'r of Soc. Sec.</u>, 169 F.3d 595, 600 (9th

5   Cir. 1999) (ALJ may properly rely on plaintiff's daily activities, and on conflict

6   between claimant's testimony of subjective complaints and objective medical

7   evidence in the record); <u>Tidwell v. Apfel</u>, 161 F.3d 599, 602 (9th Cir. 1998) (ALJ

8   may properly rely on weak objective support, lack of treatment, daily activities

9   inconsistent with total disability, and helpful medication); <u>Johnson v. Shalala</u>, 60

10  F.3d 1428, 1432 (9th Cir. 1995) (ALJ may properly rely on the fact that only

11  conservative treatment had been prescribed); <u>Orteza v. Shalala</u>, 50 F.3d 748, 750

12  (9th Cir. 1995) (ALJ may properly rely on claimant's daily activities and the lack

13  of side effects from prescribed medication).

14         Under the "<u>Cotton</u> test," where the claimant has produced objective medical

15  evidence of an impairment that could reasonably be expected to produce some

16  degree of pain and/or other symptoms, and the record is devoid of any affirmative

17  evidence of malingering, the ALJ may reject the claimant's testimony regarding

18  the severity of the claimant's pain and/or other symptoms only if the ALJ makes

19  specific findings stating clear and convincing reasons for doing so.  <u>See Cotton v.</u>

20  _____

21         [11]  The Ruling lists factors to be considered such as:  1) the individual's

22  daily activities; 2) the location, duration, frequency, and intensity of the

23  individual's pain and other symptoms; 3) factors that precipitate and aggravate the

    symptoms; 4) the type, dosage, effectiveness, and side effects of any medication

24  the individual takes or has taken to alleviate pain or other symptoms; 5) treatment,

25  other than medication, the individual receives or has received for relief of pain or

    other symptoms; 6) any measures other than treatment the individual uses or has

26  used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing

27  for 15 to 20 minutes every hour, or sleeping on a board); and 7) any other factors

    concerning the individual's functional limitations and restrictions due to pain or

28  other symptoms.  Soc. Sec. Ruling 96-7p.

1   Bowen, 799 F.2d 1403, 1407 (9th Cir. 1986); see also Smolen v. Chater, 80 F.3d

2   1273, 1281 (9th Cir. 1996); Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993);

3   Bunnell, 947 F.2d at 343.  The ALJ must set forth "findings sufficiently specific to

4   permit the court to conclude that the ALJ did not arbitrarily discredit claimant's

5   testimony."  Thomas, 278 F.3d at 958; Rollins v. Massanari, 261 F.3d 853, 856-57

6   (9th Cir. 2001); Bunnell, 947 F.2d at 345.

7       **3.   Analysis.**

8       Here, the ALJ set forth several reasons for discounting Plaintiff's

9   credibility:  (1) she had worked part-time until June 2009, which was inconsistent

10  with her allegation of inability to work and inability to focus at work due to her

11  impairments; (2) she was able to perform "many, if not most," activities of daily

12  living, including driving and using public transportation, shopping, paying bills,

13  managing finances, attending church, working, doing household chores, and

14  preparing meals; and (3) the objective medical records did not support her

15  allegations of disability.  (AR at 25 (citing id. at 174-81).)

16      **a.   Part-Time Work.**

17      Plaintiff worked part-time at a Subway for seven months after her alleged

18  date of onset of disability.  The ability to perform part-time work is a factor the

19  ALJ may consider in assessing credibility.  See, e.g., Bray v. Astrue, 554 F.3d

20  1219, 1227 (9th Cir. 2009) (claimant was not credible because she "recently

21  worked as a personal caregiver for two years, and has sought other employment

22  since then"); McCalmon v. Astrue, 319 Fed. App'x 658, 660 (9th Cir. 2009) (ALJ

23  properly considered daily activities, including part-time work, as part of his

24  assessment of medical improvement).

25      Plaintiff points out that in her February 2009 assessment, Dr. Clark noted

26  that "[Plaintiff] is employed but is having increasing difficulty managing public

27  transportation."  (JS at 22.)  Plaintiff contends this corroborates her testimony that

28  her inability to continue to perform the tasks required of her work led to her

1   termination.  (Id.)  The Court does not find this argument persuasive since any

2   unexplained "difficulty" with public transportation would appear to be unrelated

3   to performing work-related tasks at Subway.  As noted by Defendant, Dr. Clark's

4   statement regarding Plaintiff's difficulty with public transportation is also

5   inconsistent with Plaintiff's personal statement on January 7, 2009, in which she

6   stated that she used public transportation when she went out and that she can go

7   out alone.  (AR at 177.)

8        Accordingly, the Court finds that there was no error in the ALJ considering

9   Plaintiff's part-time work when assessing the credibility of her disabling

10  allegations.

11            **b.    Activities of Daily Living and Objective Medical Records.**

12       As discussed above, an ALJ may take into account a claimant's level of

13  activity, along with other probative evidence of disability or lack thereof, when

14  considering a claimant's credibility.  Magallanes, 881 F.2d at 756.  Thus, the

15  ALJ's consideration of Plaintiff's daily activities was not error.

16       Moreover, the ALJ also reviewed Plaintiff's medical records and found they

17  also did not "establish any limitations greater than those assessed herein . . . ."

18  (Id.)  "Although lack of medical evidence cannot form the sole basis for

19  discounting pain testimony, it is a factor that the ALJ can consider in his

20  credibility analysis."  Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005).  Here,

21  the ALJ gave great weight to the opinion of the consultative examiner, Dr. Ella-

22  Tamayo, whose limitations mirrored the ALJ's RFC determination, noting that

23  "[i]n light of the dearth of limitations found on physical examinations, the

24  limitations outlined by Dr. Ella-Tamayo[] give a generous benefit of the doubt to

25  the claimant's subjective complaints . . . [and] is supported by the objective

26  medical evidence."  (Id.)  He concluded that his RFC assessment was supported

27  "by the opinion of Dr. Ella-Tamayo, the objective medical evidence, the claimant's

28  admitted ability to work after the alleged onset date, and the claimant's admitted

1  ability to perform many activities of daily living." (Id.)  Thus, the lack of

2  objective medical evidence to support Plaintiff's allegations, in combination with

3  the additional reasons discussed herein, was a valid consideration for the ALJ in

4  making his credibility determination.

5       Based on the foregoing, the Court finds that the ALJ stated clear and

6  convincing reasons, supported by substantial evidence in the record, for rejecting

7  Plaintiff's credibility.  Thus, relief is not warranted on this claim.

8                                    **IV.**

9                                  **ORDER**

10       Based on the foregoing, IT THEREFORE IS ORDERED that Judgment be

11  entered affirming the decision of the Commissioner, and dismissing this action

12  with prejudice.

13

14  Dated: January 23, 2012

15                          HONORABLE OSWALD PARADA
                            United States Magistrate Judge

16

17

18

19

20

21

22

23

24

25

26

27

28